EXHIBIT A

IN THE CIRCUIT COURT IN AND FOR THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY FLORIDA

LITITIA HINSON, as Personal         Case No.: 2014CA001137CAAXMX
Representative of the Estate of
RICHARD HASTON, deceased

        Plaintiff,

vs.

JAMES WARREN, in his Individual Capacity,
and MARTIN COUNTY SHERIFF'S OFFICE
[WILLIAM D. SNYDER in his capacity as Sheriff
of Martin County, Florida]

        Defendant.

_____/

## PLAINTIFF'S THIRD AMENDED COMPLAINT

Comes Now, Plaintiff, LITITIA HINSON, as Personal Representative of the Estate of
RICHARD HASTON, deceased (hereinafter "HASTON"), by and through the undersigned
attorneys and hereby files her Complaint against JAMES WARREN, in his Individual Capacity
(hereinafter "WARREN"), for acts that occurred during the course and scope of his employment
with Defendant, the MARTIN COUNTY SHERIFF'S OFFICE [WILLIAM D. SNYDER in his
capacity as Sheriff of Martin County, Florida] (hereinafter "MCSO").

## INTRODUCTION

This case involves another in a long line of unjustified police shootings by officers of
MCSO, including four prior shootings by Defendant JAMES WARREN, in which Defendant
WARREN acted consistently with MCSO practices, policies, procedures, and customs of
condoning unjustified uses of deadly and excessive force, failing to identify, train, discipline, or
otherwise properly supervise officers who have utilized deadly and excessive force where the use

1

of such force was entirely unjustified, and ratifying the conduct of those officers with little or no investigation. This civil action arises from an incident that occurred on June 7, 2013, following the shooting and killing of RICHARD HASTON by JAMES WARREN.

Plaintiff brings federal constitutional claims against WARREN, in his Individual Capacity for committing acts, under color of law, which deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida by shooting and using deadly, excessive and unreasonable force during the encounter and arrest of HASTON. Further, Plaintiff brings federal constitutional claims against MCSO as the supervisory entity responsible for the conduct, training, and supervision of the Sheriff's Deputies under its charge. MCSO failed to properly train Sheriff's Deputies in the appropriate methods, proper procedures, and protocols with respect to utilizing appropriate levels of force during arrests. MCSO, had a policy and custom that constituted deliberate indifference to HASTON's Constitutional rights, and MCSO's policy and custom deprived HASTON of his rights under the Constitution and the laws of the State of Florida resulting in the use of deadly, excessive and unreasonable force during the arrest of HASTON.

Additionally, Plaintiff brings a Wrongful Death action against Defendant MCSO pursuant to the Florida Wrongful Death Act for the actions of Defendant WARREN in the wrongful killing of HASTON. Plaintiff also brings Negligent Hiring and Retention claims against MCSO for hiring and retaining WARREN, despite his previous criminal history and repeated involvement in uses of excessive and unconstitutional force, including deadly force.

## JURISDICTION AND VENUE

1.    Plaintiff in this action seeks relief under the Fourth and Fourteenth Amendments of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, including

compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988 and the Florida Wrongful Death Act.

2.      Venue is proper in this circuit because the Plaintiff resides in Martin County, Florida and the facts that form the basis of this action happened in Martin County, Florida.

3.      All conditions precedent to the maintenance of this action, including those notice requirements set forth in Florida Statute § 768.28, have been performed, have occurred prior to its institution, or have been waived.

**PARTIES**

4.      At all times material hereto, LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, deceased, is and was a citizen and resident of Martin County, State of Florida, is otherwise sui juris, and has been duly appointed as the Personal Representative of the Estate of RICHARD HASTON, deceased. [See Letters of Administration attached hereto as Exhibit 'A'].

5.      At all times material hereto, the statutory beneficiaries of the Estate of RICHARD HASTON, deceased, are DENNIS DAVIS and LITITIA HINSON, surviving parents and DEMARIO J. SPARKS, RASHARD B. HASTON, and JALIN HASTON, Children.

6.      Plaintiff, LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, deceased, brings this action for the decedent's wrongful death and for violation of decedents constitutional rights on behalf of all individuals entitled to a claim and for the Estate of RICHARD HASTON, deceased.

7.      At all times material hereto, Defendant JAMES WARREN was employed as a Certified Sworn Law Enforcement Officer for Defendant MARTIN COUNTY SHERIFF'S OFFICE, and was acting under the direction and control of Defendant MARTIN COUNTY

SHERIFF'S OFFICE, in such capacity as an agent, servant, and employee of the Defendant MARTIN COUNTY SHERIFF'S OFFICE. Upon information and belief, and at all times material hereto, Defendant WARREN participated in the unconstitutional violations and other wrongful acts that occurred on June 7, 2013, at which time he was acting within the course and scope of his employment under color of state law. Defendant WARREN is and was a citizen of the State of Florida and is otherwise sui juris.

8.     At all times material hereto, MCSO [WILLIAM D. SNYDER in his capacity as Sheriff of Martin County, Florida] is an entity, corporate and political, duly organized under the laws of the State of Florida. MCSO is the governmental entity responsible as a matter of law, for the actions of its officials, agents and employees and was responsible for their training, supervision and conduct. MCSO is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.

9.     Plaintiff sues Defendant WARREN in his Individual Capacity.

## FACTUAL ALLEGATIONS

### *Events which Occurred on June 7, 2013*

10.     In the early morning hours of June 7, 2013, HASTON and a female companion, HANNAH COLLEY, were sitting in their car in the parking lot of Scooter's Restaurant, Hobe Sound, Florida. HASTON had been an earlier patron of Scooter's.

11.     HASTON and COLLEY were lawfully parked in the Scooter's parking lot.

12.     Defendant WARREN, without any probable cause or justification, pulled his patrol car next to HASTON's vehicle and immediately exited to approach HASTON. Defendant WARREN approached HASTON's driver side window and required HASTON to roll down his window.

4

13.     Alleging that HASTON was in violation of a county ordinance for drinking an alcoholic beverage within 500 feet of an establishment, Defendant WARREN ordered HASTON out of his vehicle as he was placed under arrest.

14.     Defendant WARREN, without any provocation or incitement on behalf of HASTON, proceeded to escalate the encounter by forcibly slamming a fully compliant HASTON against the vehicle.

15.     HASTON, fearing for his safety, retreated around the back of the vehicle and across the parking lot. HASTON returned to the vehicle and entered the driver's seat. HASTON placed the car into gear and started to drive the vehicle away from Defendant WARREN. Defendant WARREN continued to run towards the vehicle as it drove away, thereby inserting himself at or near the front of a moving vehicle and placing himself at risk and in a foreseeable and avoidable zone of danger.

16.     While standing off to the side of the front driver's side fender, and after the vehicle had been placed in motion in a direction moving away from Defendant WARREN, Defendant WARREN discharged his firearm two (2) times through the front windsheild of the vehicle, striking HASTON, causing gunshot wounds to HASTON's chest and hands.

17.     There existed no warrant for the arrest of HASTON nor was there any probable cause or arguable cause for his apprehension with such violence.

18.     Following the shooting of HASTON, Defendant WARREN did not provide any emergency medical services to HASTON or allow COLLEY to do so. Rather, HASTON forcibly extracted a critically wounded, scared, and unarmed individual who was gasping for his last breaths from the vehicle and slammed him to the floor.

5

19.     Thereafter, Defendant WARREN proceeded to empty HASTON's pockets in what can only be described as an unsuccessful attempt to justify the shooting after the fact.

20.     Defendant WARREN continued to stand over HASTON refusing to provide medical attention and ordering COLLEY not to approach for over eight (8) minutes until Emergency Medical Services arrived.

21.     Fire Rescue ultimately responded to the scene. No medical treatment could be provided as HASTON was determined to be deceased upon their arrival.

22.     In an effort to cover up his illegal use of deadly force, unlawful detention, unlawful arrest, improper handling of the incident involving a minor violation of a local ordinance, and overall gross negligence, which resulted in the improper use of deadly force, Defendant WARREN with the potential assistance of other MCSO Deputies fabricated an elaborate story about HASTON driving the vehicle into Defendant WARREN, dragging him backwards, and refusing repeated orders leaving Defendant WARREN no choice but to fire two rounds into the windshield from close range.

23.     The police reports and recorded interviews prepared by WARREN, and other MCSO Deputies, for submission to reviewing authorities contained false statements and/or material omissions, and included a fabricated chain of events that was the result of collusion between Defendant WARREN and the other responding Deputies.

24.     Later in the afternoon on June 7, 2013, Defendant WARREN gave a recorded statement regarding the incident. During this recorded statement, Defendant WARREN provided the interviewing officers with an even more detailed version of his elaborate tale of the events that unfolded which clearly included false statements, material omissions, and a fabricated chain of events.

6

25.     The conduct of Defendant WARREN occurred under the color of State Law.

26.     Due to Defendant WARREN's lack of fear that any of his colleagues would find his actions improper and report him for improper conduct and the lack of discipline or consequences toward Defendant WARREN who wantonly violated Plaintiff's rights and caused his death, it is clear that the actions of Defendant WARREN reflect a custom, policy, and practice of Defendant MCSO.

27.     Since none of the responding officers reported anything improper or unusual to their superiors, it is clear that all of the officers on the scene consider violation of rights and inflicting deadly force persons being arrested for minor ordinance violations to be standard procedure and consistent with the policy, custom, practice, and training of MCSO.

28.     MCSO's Internal Affairs investigation into the incident found no wrongdoing and thus condoned all actions taken by WARREN upon HASTON.

29.     HASTON's civil rights pursuant to the Fourth Amendment were violated with the use of deadly force by Defendant WARREN, when Defendant WARREN fired two (2) bullets through the windshield of HASTON's vehicle striking him in the chest, forcibly removed him from the vehicle despite being critically injured and slammed him to the ground, and failed to render any medical aid causing HASTON to not receive any medical treatment for over eight (8) minutes until Emergency Medical Services arrived on scene resulting in his death.

30.     Defendant MCSO knew or should have known the dangerous propensities of Defendant WARREN to engage in unlawful conduct, including the use of deadly force, in his employment as officers for MCSO, based on his prior unlawful conduct.

*Common Practice for MCSO*

31.　On a daily basis, Deputy Sheriffs come into contact with unarmed and non-threatening individuals during their patrolling duties. In order to adequately deal with the certainty of police contact with unarmed and non-threatening individuals, MCSO is charged with supplying the public with a police force that is adequately trained and equipped to handle calls dealing with those who are unarmed and non-threatening. Despite this daily contact, Defendant MCSO made no effort to adequately train and supervise said deputies.

32.　MCSO was aware that there needed to be effective supervision and a command structure in place to deal with the problem of responding to incidents with unarmed and non-threatening individuals. MCSO failed to provide adequate supervision of its deputies in the field when said deputies encounter those who are unarmed and non-threatening.

33.　At all times material hereto, MCSO was responsible for adopting and implementing the rules and regulations specifically in relation to hiring, screening, training, supervising, controlling, disciplining, and assigning deputies to their respective duties within Martin County, Florida.

34.　MCSO has maintained a custom of deadly and/or excessive force in executing arrests by its sworn law enforcement officers. At all times material hereto, under MCSO General Order 103.00 for Use of Deadly Force, officers are authorized to use only such force as necessary.

35.　MCSO's actions in this case and previous similar situations indicate a policy and custom of indifference to the rights of those they arrest who are unarmed and non-threatening and a failure to properly train and/or supervise their officers in how to deal with unarmed and non-threatening persons being arrested. MCSO's refusal to adequately train its deputies on how

8

to interact with unarmed and non-threatening persons—and MCSO's failure to supervise those deputies—has resulted in the infliction of deadly and/or excessive violence upon unarmed and non-threatening persons and the violation of their constitutional rights. This lack of training and supervision causes these ill-trained and ill-equipped deputies to resort to the use of deadly or excessive force as their only alternative.

36.     MCSO deputies have increasingly and alarmingly used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force.  There has specifically been an increasing and alarming number of similar incidents where MCSO deputies have utilized deadly or excessive force resulting in death or seriously injuries against these individuals or endangered the public by the intentional and/or negligent misconduct by MCSO deputies.  A review of the complaints surrounding and investigations of these incidents shows a conscious disregard to the facts and circumstances surrounding each incident and a blanket justification of the actions of the deputies involved.

37.     Further, there has been a pattern of similar incidents in which citizens were unjustifiably killed, seriously injured, or otherwise endangered by the intentional and/or negligent misconduct of MCSO officers, revealing serious incompetence or misbehavior that is general or widespread throughout the department.

38.     Evidencing a pattern of similar incidents and Defendant MCSO's awareness that its deputies are repeatedly being accused of violating constitutional rights for conduct similar to what occurred in the incident described above, examples of similar incidents that occurred prior to the incident alleged in this Complaint that also resulted in federal lawsuits alleging constitutional violations are as follows:

9

a.      On or about January 14, 2002, in Stuart, Florida, MCSO deputies responded to the scene of a domestic dispute. Without justification or provocation, the MCSO deputies allowed a K-9 unit to attack an unarmed, non-threatening, and sleeping victim. MCSO deputies stood by and failed to intervene as the dog attacked the helpless individual for an extended period of time. Only after the victim was bleeding profusely and obviously injured did the MCSO deputies call the dog off of the victim. Notwithstanding, the MCSO deputies proceeded to immediately pepper spray and use physical force against the significantly injured individual. Despite having committed no crime and having no cause for arrest, thereafter, they handcuffed him and took this individual into custody. Such lack of cause was realized upon arrival at the hospital as no charges were filed against this individual. The individual suffered significant injuries. Despite evidence supporting the unconstitutional excessive force of the deputy involved, MCSO took no disciplinary action against this officer who inflicted this excessive force and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests, even those arrests which have no basis. The arrestee brought a federal lawsuit against Robert L. Crowder as the Sheriff of Martin County in the United States District Court for the Southern District of Florida, CASE No.: 03-14627-CIV-Middlebrooks/Lynch. The arrestee brought counts of Negligence, Excessive Force/Battery, and Violation of Constitutional Rights pursuant to 42 U.S.C. § 1983.The parties filed a stipulation of dismissal on June 24, 2004 with the terms of the dismissal and settlement unknown.

b.      On or about March 17, 2005, in Hobe Sound, Florida, MCSO deputies approached a parked vehicle with three occupants that had not been reported to have been involved in any crime or criminal event. Without justification or provocation, the MCSO deputies required the individuals to provide identification, which was refused and the individuals

drove away. Despite no cause to initiate a chase, MCSO deputies began chasing after the vehicle, ultimately at a high rate of speed. MCSO set up a road block causing the vehicle to come to a stop. MCSO deputies approached the vehicle with guns drawn and despite the passenger's hands being raised proceeded to shoot into the vehicle multiple times when the driver attempted to drive away. The driver was killed and the front seat passenger was struck in the back causing serious injuries and hospitalization. The MCSO deputies after the fact falsely alleged that the vehicle involved had been stolen in an attempt to justify the shooting. Charges relating to the stolen vehicle were dismissed by the State attorney against the passenger. The passenger brought a federal lawsuit against Robert L. Crowder as the Sherriff of Martin County and the individual deputies in the United States District Court for the Southern District of Florida, CASE No.: 09-14087-CIV-Moore/Lynch. The arrestee brought one count of Violation of Civil Rights pursuant to 42 U.S.C. § 1983 against the individual deputies while acting under the color of law and counts of Negligence and Assault and Battery. The parties filed a stipulation of dismissal on September 21, 2009 and requested a period of sixty days to enforce the terms of an unknown settlement agreement.

        c.     In 2007 and 2008, a MCSO Deputy was the subject of multiple complaints of sexual assault and ultimately was adjudicated criminally guilty and sentenced to one year in jail. MCSO, Sheriff Crowder, and Defendant WARREN were all aware of this MCSO deputy's proclivities towards soliciting sex from those females who contacted the Sheriff's office for assistance. The deputy had been the subject of internal affairs investigations which were found unsubstantiated which did nothing but shield and encourage this MCSO deputy and failed to protect the victims of his sexual assault. One such person who was subject to the sexual assault brought a federal lawsuit against Robert L. Crowder as the Sherriff of Martin County, Martin

County, and the individual deputy in the United States District Court for the Southern District of Florida, CASE No.: 02:12-cv-14290-KMM. The plaintiff brought counts of Sexual Assault and Battery and Intentional Infliction of Emotional Distress against the individual deputy and counts of Negligent Hiring, Negligent Training, Negligent Retention, Violations of Constitutional Rights pursuant to 42 U.S.C. §1983, and Intentional Infliction of Emotional Distress. The parties on August 28, 2013 notified the Court that a settlement had been reached.

      d.    On or about April 25, 2008, in Palm City, Florida, MCSO deputies responded to the scene of a domestic dispute. Without justification or cause, the MCSO deputies forcibly burst through the front door of an individual's home. MCSO deputies thereafter detained and handcuffed the individual. Notwithstanding being under the full control of MCSO deputies and the individual being fully compliant, the deputies proceeded to forcibly hold the individual on the ground and deploy a Taser Stun Gun into the chest. The individual suffered significant injuries. Despite such force being used and injuries sustained, no incident report was ever filed and the use of force was never investigated. The individual brought a federal lawsuit against Palm City, Martin County Sheriff's Office, and the individual deputies in the United States District Court for the Southern District of Florida, CASE No.: 2:09-cv-14300-JEM. The individual brought counts of Violation of his Civil Rights pursuant to 42 U.S.C. § 1983, Assault and Battery, Negligent Hiring and Supervising, Unreasonable and Negligent Force in Arrest, Spoliation of Evidence, and False Arrest/Imprisonment. This matter was dismissed without prejudice due to lack of prosecution.

      e.    On or about May 20, 2012, on I95 in Martin County, Florida, MCSO deputies responded to the scene of a flipped SUV in the median. Multiple good Samaritans stopped and helped the individuals out of the SUV and took photographs. Without justification or cause, a

MCSO deputy forcibly took one such good Samaritan's cell phone and refused to return it. Without cause or reason, the deputy thereafter arrested the good Samaritan and forcibly escorted him to the patrol car. The good Samaritan brought a federal lawsuit against the Sheriff William D. Snyder and the individual deputy in the United States District Court for the Southern District of Florida, CASE No.: 2:16-cv-14162-RLR. The good Samaritan brought counts of Violation of his Civil Rights pursuant to 42 U.S.C. § 1983 and False Arrest against the individual deputy, and counts of Violation of his Civil Rights pursuant to 42 U.S.C. § 1983 against MCSO. This matter was dismissed without prejudice due to lack of prosecution. This case is still pending with the United States District Court for the Southern District of Florida.

      f.      On October 20 2012, following a DUI arrest, an arrestee was transported to Martin County Sheriff's Office jail for booking and detention. During the booking, multiple MCSO deputies without justification unlawfully battered the arrestee resulting in significant and debilitating injuries. MCSO refused to provide medical attention and it was not until the arresting FHP Trooper returned to the jail that the arrestee received medical attention, namely transporting to Martin Memorial Hospital where he was diagnosed with a fractured humerus. The Fracture was immobilized and he was returned to MCSO jail where the same MCSO deputies forced the arrestee to remove the immobilization wrap/sling. This removal resulted in instaneous further injury and required the immediate surgical insertion of rods, plates and screws. Despite the entirety of the altercation being captured on video and the filing of a formal complaint, MCSO cleared its deputies of any wrongdoing. The arrestee brought a federal lawsuit against MCSO in the United States District Court for the Southern District of Florida, CASE No.: 2:16-cv-14476-RLR. The arrestee brought counts of Negligence and Ratification of Unconstitutional Conduct.

This matter was dismissed without prejudice due to lack of prosecution. This case is still pending with the United States District Court for the Southern District of Florida.

39.     MCSO further was aware that Defendant WARREN was unfit to be a MCSO Deputy and that Defendant WARREN, himself, had repeatedly been accused of violating constitutional rights for conduct similar to what occurred in the incident described above. Specifically:

a.     On December 7, 1981, prior to Defendant WARREN ever becoming a MCSO Deputy, Defendant WARREN was arrested and charged with Fleeing and Alluding after "quickly" driving away from an officer following a stop. As a result Defendant WARREN's driver's license was suspended.

b.     On January 19, 1983, in Stuart, Florida, prior to Defendant WARREN ever becoming a MCSO Deputy, Defendant WARREN was arrested and charged with Criminal Mischief. It was reported that Defendant WARREN unlawfully, willfully, and maliciously damaged a bathroom by tearing up bathroom fixtures. Defendant WARREN pled "No Contest" to the charges and was sentenced to six (6) months of probation.

c.     Notwithstanding Defendant WARREN's criminal history, he was appointed as a sworn deputy on October 15, 1985.

d.     Less than two months thereafter, on December 1, 1985, in a letter to Sheriff James Holt from Lieutenant Bill Curry, Lt. Curry indicated that Defendant WARREN was sufficiently lacking in the areas of his "attitude toward [the] public, expressing himself to others, and general duties/experience with [the] public."

e.     On September 29, 1990, Defendant WARREN was involved in an incident wherein Defendant WARREN was found to have become irritated when he found that the

14

subject was taping their conversation. Defendant WARREN thereafter physically turned the machine off and verbally attacked the subject with profanity. After an internal affairs review, Defendant Warren was issued a written reprimand and reminded that "even though he became irritated, he was to place himself above this type of behavior and should refrain from further outburst of this nature in the future."

     f.     In a Performance Evaluation on April 30, 1992, it was indicated that Defendant WARREN "has a tendency to let people provoke him and lose his temper."

     g.     In a Performance Evaluation on June 30, 1992, Defendant WARREN was reminded that public contact was an area that he had to work on.

     h.     In January of 1996, allegations were levied against Defendant WARREN for False Arrest, Harassment, and Perjury. After an investigation, these claims were determined unfounded.

     i.     On August 23, 2000, Defendant WARREN was the subject of an official complaint for verbal abuse. Defendant WARREN approached a backed in vehicle at a rest stop which he indicated "based on [his] experience, a lotta people with stolen cars back their cars in so you can't see their tag." After waking a sleeping complainant, Defendant WARREN was accused of verbally attacking the complainant with profanity and wrongfully accusing the complainant of driving a stolen vehicle. The complainant also alleged that Defendant WARREN acted with racial motives. The investigation was closed with a finding of "Not Sustained."

     j.     On August 7, 2004, on I-95 in Stuart, Florida, Defendant WARREN conducted a traffic stop. Defendant WARREN arrested the individual for felony traffic charges. While performing the arrest, Defendant WARREN utilized O.C. Spray to the face and drew his firearm

15

on an unarmed individual. Upon review, it was determined that the use of force by Defendant Warren was necessary to effect arrest.

k.      On September 27, 2008, in Stuart, Florida, Defendant WARREN was involved in a high speed chase. Defendant WARREN deployed a P.I.T. maneuver to immobilize the vehicle. Thereafter, physical force was utilized to restrain the individuals in the vehicle. Defendant WARREN's use of force and P.I.T. maneuver was determined to be the appropriate level of force.

l.      On July 18, 2009, in Palm City, Florida, after observing a traffic violation, Defendant WARREN conducted a traffic stop. Defendant WARREN without justification or provocation forcibly removed an unarmed individual from the vehicle and proceeded to deploy his Taser in drive stun mode multiple time and utilize physical force to restrain and handcuff the individual. As a result of the force used, the individual suffered significant lacerations to the head and required transportation to Martin Memorial Hospital. Despite this use of excessive force on an unarmed individual who had only committed a minor traffic infraction, Defendant WARREN received no discipline or correction for his actions.

m.      Additionally, Defendant WARREN has received dozens of citizen complaints and been involved in numerous incidents regarding his failure to properly respond to calls, use of inappropriate and abusive language, use of excessive force during arrests, and involvement in chases following routine traffic stops causing injuries to individuals. Despite these repeated complaints and incidents, Defendant MCSO failed to take any action against Defendant WARREN to discipline, train, or otherwise correct this improper conduct.

40.      In addition to the incidents and complaints outlined in the previous paragraph, Defendant WARREN has been involved in at least seven (7) other shootings while on duty as a

16

deputy of MCSO. Each of these shootings should have provided warning to Defendant MCSO of Defendant WARREN's unfitness for duty, his need for additional training and supervision, and Defendant Warren's tendency to use unnecessary and excessive force, particularly deadly force, during arrests of unarmed individuals. Defendant MCSO's failure to take action following each of these incidents and, rather, their approval of Defendant WARREN's conduct and actions, either through formal review or the lack thereof, created the custom, policy, and practice that Defendant WARREN could use excessive and deadly force as he saw fit rather than as required pursuant to MCSO official policies.

41. The **Seven** (7) shootings include Defendant WARREN deploying his MCSO issued firearm at **Four (4)** individuals and **Three (3)** animals. Only one of these shootings was documented by MCSO, and as such all information regarding said shootings was discovered in Defendant WARREN's deposition in the case of *Tuhey v. Robert Crowder, James Warren, et. a*l, CASE No.: 04-14296-CIV-GRAHAM. The known details of the shootings are as follows:

a. Defendant WARREN shot and killed a bobcat while on duty because it was "foaming at [him] …. and didn't want to get bit"

b. Defendant WARREN shot at a dog who was a threat to livestock, but he did not hit the dog and the dog ran away.

c. Defendant WARREN shot at a snake on a school playground.

d. Defendant WARREN was involved in a shooting under former Sheriff Holt on I-95. Defendant WARREN was out of his vehicle and fired at a moving vehicle which Defendant WARREN alleged was swerving towards him. The vehicle was driving the speed limit and did not hit Defendant WARREN or his vehicle.

17

e.  Defendant WARREN discharged his weapon at a fleeing individual following a chase. The individual was unarmed and exited the vehicle. Defendant WARREN fired one round missing the individual as he was running away. This shooting was never discussed with Defendant WARREN and Defendant WARREN was never told whether he acted correctly or incorrectly. Defendant WARREN did indicate that he believed that the shooting was found justified.

f.  In 2002, Defendant WARREN shot at an individual who had an outstanding warrant for arrest as he fled into the woods. Defendant WARREN did not know if the shooting was ever investigated and could not provide any specifics about the individual involved. He did know that he was never provided with any formal findings of any investigation or given any instructions or commentary as to his actions.

g.  On or about October 26, 2003, in Martin County, Florida, MCSO deputies including Defendant WARREN engaged in a chase in pursuit Glenn Tuhey following a call that Tuhey had stolen a checkbook from a Hess gas station. After taking measures to stop the Tuhey's vehicle, Tuhey came to a complete stop. There Tuhey sat in his vehicle, unarmed, and making no threats, gestures, or threatening motions to any persons, including MCSO deputies. Without cause, provocation, or warning Defendant WARREN and the other MCSO deputies fired their pistols and shotguns at Tuhey as he sat in the vehicle. As Tuhey exited the vehicle, with his hands above his head and in clear view, Defendant WARREN and the other deputies continued to fire at him. As a result being struck by multiple bullets, Tuhey fell to the ground and lied face down with his arms and legs spread in a defenseless position. Defendant WARREN and other MCSO deputies again unjustifiably used deadly force by continuing to fire their pistols and shotguns at Tuhey as he law still face down on the ground. Defendant WARREN thereafter

18

walked over to Tuhey as he pled for his life, cursed at Tuhey, told him he wished he would have killed him, and proceeded to maliciously and viciously kick him in the side. Defendant WARREN needed to be warned by a fellow deputy to stop striking Tuhey as he lay motionless on the ground. Tuhey brought a federal lawsuit against the Sheriff Crowder, Defendant WARREN and the other individual deputies involved in the United States District Court for the Southern District of Florida, CASE No.: 04-14296-CIV-GRAHAM. Tuhey brought counts of Deprivation of his Civil Rights pursuant to 42 U.S.C. § 1983 and Assault and Battery against Defendant WARREN and the other deputies, and counts of Deprivation of his Civil Rights pursuant to 42 U.S.C. § 1983 and Negligence against Sheriff Crowder. This case was settled at mediation on October 11, 2005.

42.     MCSO has maintained a long-standing, widespread history of failure to train, supervise, or otherwise discipline its police officers for, among other things, the use of deadly or excessive force, unlawful detentions, and/or arrests even though it had notice of this unlawful conduct by its employees and the public.

43.     MCSO has maintained a system of review for abuses of lawful authority like the illegal use of force (including deadly force), unlawful detention, and/or arrests, among other things, by sworn law enforcement officers and complaints thereof, which has failed to identify improper use of force by police officers and to subject police officers who employed such acts to appropriate discipline, closer supervision, and/or retaining, to the extent that it has become the de facto policy and custom of MCSO to tolerate such acts by its officers.

44.     Indeed, MCSO routinely performs cursory investigations of incidents involving extremely questionable use of excessive force on the part of MCSO deputies, with an eye toward exonerating the deputy involved rather than finding out the truth.     Almost uniformly,

19

investigators and supervisors uncritically endorse the deputies' versions of events, even when those versions are incomplete, inconsistent, or are in direct contradiction of objective evidence. The result is that these incidents involving questionable use of force are not properly or impartially investigated, documented, or addressed with corrective measures where warranted.

45.     Due to this intentionally inadequate investigative process, in virtually all deadly force and excessive force incidents, MCSO has declared the conduct of its deputies to be justified, particularly in those involving unarmed and non-threatening persons.

46.     MCSO's foregoing acts, omissions, policies, or customs caused law enforcement officers, including Defendant WARREN, to believe that acts such as the improper use of force (including deadly force), unlawful detentions, unlawful arrests and the improper handling of incidents involving unarmed and non-threatening persons, would not be properly investigated. The consistent lack of accountability within MCSO for the questionable and often unjustifiable use of excessive force has promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens. The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

47.     Despite MCSO's notice and knowledge of the dangerous propensities of Defendant WARREN because of said officer's prior history of use of excessive force and lack of training, skill and/or experience, MCSO failed to implement any policies or programs to train said officer, failed to counsel or even discuss his prior incidents with Defendant WARREN, or otherwise intentionally failed to protect the public, including HASTON from his danger.

48.     MCSO had policies, customs, and practices that constituted deliberate indifference to HASTON'S Constitutional Rights pursuant to the Fourth and Fourteenth

20

Amendments, and MCSO's policies and customs caused the violation of HASTON's rights and/or was the moving force behind such Constitutional violations as indicated by the facts described above.

49.    MCSO's deliberate indifference towards HASTON and other unarmed and non-threatening persons led to deadly force being used against HASTON through the firing of two bullets through the windshield of his vehicle striking HASTON in the chest, the forcible removal and slamming to the ground of HASTON from the vehicle thereafter despite him being critically injured, and the failure to render any medical aid causing HASTON to not receive any medical treatment for over eight (8) minutes until Emergency Medical Services arrived on scene.

50.    The policies, customs, and practices complained of include, but are not limited to, the following:

    a.    Deliberate indifference by failing to adequately screen deputies and by failing to follow hiring protocols for sworn law enforcement officers;

    b.    Deliberate indifference by failing to institute an appropriate policy for the detention of unarmed and non-threatening persons and by failing to enforce such a policy, if such a policy was in place;

    c.    Deliberate indifference by failing to ensure that MCSO employees were sufficiently trained or otherwise educated in the extension and management of non-threatening arrests from the perspective of the arresting officer(s), dispatch officers and supervising or managing officers;

    d.    Deliberate indifference by failing to provide sufficient supervision of the use of deadly force in question and by failing to monitor the force in question;

e.      Deliberate indifference by improperly training MCSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict death or harm upon persons being arrested;

f.      Deliberate indifference by improperly training MCSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict death or harm upon unarmed and non-threatening persons they encounter;

g.      Deliberate indifference in failing to properly supervise MCSO Deputies in their encounters with persons they arrest;

h.      Deliberate indifference in failing to have Deputies properly reviewed for accurate use of force of incidents involving force used against arrested persons and unarmed or non-threatening persons, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information; and

i.      Deliberate indifference in failing to determine whether said employees, including Defendant WARREN, posed a threat to the public as a result of their propensity to commit unlawful acts.

51.      The Defendant MCSO was grossly and willfully negligent in the selection and/or training and/or supervision and/or retention of Defendant WARREN as sworn law enforcement officer of Defendant MCSO, in that:

a.      It failed to properly screen Defendant WARREN when he was hired as sworn law enforcement officers;

     b.     It appointed Defendant WARREN as a sworn law enforcement officer when it knew or, in the exercise of reasonable care, should have known of the Defendant's dispositions to engage in such unlawful conduct;

     c.     Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents and employees, MCSO has failed to and refused to: (1) remove Defendant WARREN from his positions as a sworn law enforcement officer; (2) take any disciplinary action against Defendant WARREN; (3) provide any retraining to Defendant WARREN; and (4) provide redress for citizens, such as the Plaintiff, who have been injured thereby.

52.     MCSO's deliberate indifference, failure to train, failure to effectively supervise, and permission (and toleration of) the patterns and practices enumerated above, were the moving forces causing the death of HASTON and the violation of HASTON's Constitutional Rights.

53.     The actions of Defendant WARREN in this case and in the other instances outlined above, as well as the actions of Defendant MCSO in other similar situations, indicate that Defendant WARREN who violated HASTON's rights acted in accordance with MCSO's policies and reflect policies that were adopted by MCSO and their high ranking officials.

54.     The failure of MCSO to competently investigate use of force incidents (including deadly force) and encounters with unarmed and non-threatening persons, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly condone the egregious misconduct of the officers involved. The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and substitutes in their place a permissive de facto policy and custom of tolerating excessive force, which will invariably have the effect of promoting similar misconduct by other deputies in the future. In sum, the pattern

and practice of the excessive use of force on the part of MCSO officers stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of incidents involving deadly and excessive force.

## COUNT I
## WRONGFUL DEATH ACTION

55.     Plaintiff, LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, deceased, realleges the allegations contained in Paragraphs 1 through 8, 10 through 33, 39 through 42, 47, 50 through 52, and 54 as if fully set forth herein.

56.     Plaintiff files this cause of action pursuant to the Florida Wrongful Death Act.

57.     The survivors include are DENNIS DAVIS and LITITIA HINSON, surviving parents and DEMARIO J. SPARKS, RASHARD B. HASTON, and JALIN HASTON, Children.

58.     At all material times, Defendant, MCSO, had a duty to act reasonable to the public, including, but not limited to individuals such as RICHARD HASTON.

59.     At all material times, the Defendant, MCSO, through its employees, agents and/or apparent agents, including but not limited to Deputy James Warren, was below the standard of care, and acted in a negligent manner as follows:

  a.     Using deadly force upon HASTON, when non-deadly force was reasonable and appropriate under the circumstances;

  b.     Failure to be trained to use proper police technique during arrests of unarmed and non-threatening individuals;

  c.     Failing to utilize non-deadly force in a situation that required such use;

  d.     Inserting himself at or near the front of a moving vehicle and placing himself at risk and in a foreseeable and avoidable zone of danger;

  e.     Firing two (2) bullets through the windshield of HASTON's vehicle

striking him in the chest, forcibly removing HASTON from the vehicle despite being critically injured and slamming him to the ground, and failing to render any medical aid causing HASTON to not receive any medical treatment for over eight (8) minutes until Emergency Medical Services arrived on scene.

        f.     Failing to follow policies and procedures regarding use of deadly and non-deadly force;

        g.     Under all the circumstances failing to act reasonably, including using deadly force when such force should and could have been avoided if acting as a reasonable and prudent law enforcement officer.

60.     As a direct and proximate result of the above negligence of the Defendant, MCSO through its employees, agents and/or apparent agents, including but not limited to Deputy James Warren, HASTON was wrongfully killed.

61.     LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, alleges all damages recoverable under wrongful death statute, including but not limited to the mental pain and suffering, which will continue to suffer for the rest of the survivors' lives, the loss of services and support of HASTON, loss of net accumulations to the estate that would have been left as part of his estate if he had survived and lived his normal life expectancy, the funeral expenses as a result of HASTON's death, and the loss of HASTON's love and companionship.

WHEREFORE, Plaintiffs pray for the following relief:

a.     Judgment for damages against Defendant MCSO;

b.     Trial by jury as to all issues so triable; and

c.     Such other relief as this Honorable Court may deem just and appropriate.

## COUNT II
## 42 U.S.C. § 1983 – Excessive Use of Force By Defendant WARREN

62.     Plaintiff realleges the allegations contained in Paragraphs 1 through 7, and 9 through 29, as if fully set forth herein.

63.     This is an action for damages against Defendant WARREN for the deprivation of HASTON's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983.

64.     The deadly force used by Defendant WARREN against HASTON during the course of HASTON's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of HASTON's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

65.     Defendant WARREN used unreasonable and excessive force against HASTON when he fired two (2) bullets through the windshield of HASTON's vehicle striking him in the chest, forcibly removed him from the vehicle despite being critically injured and slammed him to the ground, and failed to render any medical aid causing HASTON to not receive any medical treatment for over eight (8) minutes until Emergency Medical Services arrived on scene.

66.     Defendant WARREN committed the acts described hereinabove in a gross disregard of Plaintiff HASTON's constitutional rights while acting under color of law, and specifically deprived HASTON of his constitutional right to be free from excessive police force under the Fourth Amendment.

67.     No reasonable officer, confronted with the facts and circumstances confronting Defendant WARREN, would have believed that the force used on HASTON on June 7, 2013 was objectively reasonable and not in violation of HASTON's clearly established rights under the Fourth Amendment.

68.     Defendant WARREN acted knowingly, intentionally, and maliciously, and/or

26

with a reckless or callous indifference to the federally protected rights of HASTON.

69.    As a result of Defendant WARREN's conduct, HASTON suffered physical injury, pain, suffering, emotional distress, disability, and death.

70.    As a result of HASTON's injury and death, Plaintiff is entitled to recover all damages allowable for violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray for the following relief:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary or punitive damages;

c.    Cost of suit;

d.    Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.    Trial by jury as to all issues so triable; and

f.    Such other relief as this Honorable Court may deem just and appropriate.

## COUNT III
### 42. U.S.C. § 1983 - Deliberate Indifference by Defendant MCSO

71.    Plaintiff realleges the allegations contained in Paragraphs 1 through 8, and 10 through 54, as if fully set forth herein.

72.    Defendant WARREN, while acting under color of law, deprived HASTON of rights and privileges secured to him by the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

73.    The actions and omissions of Defendant WARREN resulted in violations of HASTONS's Fourth Amendment Rights, with Defendant WARREN firing two (2) bullets through the windshield of HASTON's vehicle striking him in the chest, forcibly removing HASTON from the vehicle despite being critically injured and slamming him to the ground, and failing to render any medical aid causing HASTON to not receive any medical treatment for over

eight (8) minutes until Emergency Medical Services arrived on scene.

74. Defendant MCSO violated the Plaintiffs' Fourth Amendment rights by failing to train its deputies to reasonably respond to individuals that are unarmed and non-threatening and by engaging in policies and practices that caused constitutional violations to people that are unarmed and non-threatening by inappropriately responding to non-threatening situations with excessive and/or deadly force.

75. MCSO has had a history of similar violations by its Deputies who were not properly trained to reasonably and properly respond to individuals who are unarmed and non-threatening.

76. These similar incidents include, but are not limited to, those which are specifically enumerated in Paragraphs 38 through 41 of this Complaint. Many of these similar incidents resulted in the filing of a complaint with MCSO's Internal Affairs' Department, and a number of these similar incidents led to lawsuits resulting in the payment of awards or settlements by MCSO.

77. These complaints, incidents, and lawsuits served to put Defendant MCSO on notice and provided subjective knowledge of Defendant MCSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant MCSO's approach to the use of force, particularly in officer-related shootings and encounters with unarmed and non-threatening individuals.

78. As illustrated in Paragraphs 39 through 41 of this Complaint, the incidents, shootings, and litigation history involving Defendant WARREN specifically put Defendant MCSO on notice of Defendant WARREN's unfitness for duty as a sworn deputy and provided subjective knowledge of Defendant MCSO's need for better policies, procedures, customs, and

practices as to the numerous deficiencies in Defendant WARREN's approach to the use of force, particularly when involved in officer-related shootings and encounters with unarmed and non-threatening individuals.

79.     Defendant MCSO, through its policy custom, or usage, also hired deputies who were substandard and who were not properly trained and disciplined, including Defendant WARREN, who specifically had a criminal history and lacked sufficient defensive tactics training on the proper use of firearms, communications skills, and decision making skills.

80.     These constitutional deprivations were caused by Defendant MCSO's failure to adequately screen its employees and Defendant MCSO's failure to follow the proper hiring protocol, as set forth by its own handbook, before an offer of employment to a sworn law enforcement officer is extended.

81.     These constitutional deprivations were further caused by Defendant MCSO's lack of training and supervision as to its deputies having the ability and knowledge to appropriately interact with unarmed and non-threatening individuals without causing death or physical injury.

82.     Defendant MCSO ratified the misconduct of Defendant WARREN against HASTON including the use of deadly force, by failing to discipline Defendant WARREN, failing to conduct an adequate shooting investigation, and/or covering up Defendant WARREN's misconduct.

83.     Defendant WARREN knew or should have known that HASTON was unarmed and non-threatening, and should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

84.     The force used by Defendant WARREN against Plaintiff during the course of HASTON's arrest was objectively inhuman and unnecessary and constituted the unreasonable

and excessive use of force, in violation of the Plaintiffs' clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

85.     At no time was HASTON under suspicion of committing a serious crime. At no time was he suspected of possessing nor did he possess a weapon. At no time did HASTON pose an immediate threat of violence to Defendant WARREN or any other person.

86.     No reasonable officer, confronted with the facts and circumstances confronting Defendant WARREN, would have believed that the force used on HASTON on June 7, 2013 was objectively reasonable and not in violation of HASTON's clearly established rights under the Fourth Amendment.

87.     As a result of Defendant MCSO's conduct, and that of Defendant WARREN, HASTON suffered physical injury, pain, suffering, emotional distress, disability, and death.

88.     As a result of HASTON's injury and death, Plaintiff is entitled to recover all damages allowable for violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

### COUNT IV
### 42 U.S.C. § 1983 Claim Against Defendant Martin County Sheriff's Office
### [William D. Snyder in his capacity as Sheriff of Martin County, Florida]
### For Supervisory Liability

89.     Plaintiff realleges the allegations contained in Paragraphs 1 through 8, and 10

through 54, as if fully set forth herein.

90.     Defendant MCSO violated HASTON's Fourth Amendment freedom from being subjected to excessive force and Fourteenth Amendment substantive due process when MCSO failed to adequately train deputies/officers to respond to calls involving unarmed and non-threatening individuals.

91.     MCSO's chief policy maker, Sheriff Snyder, is responsible for the implementation and promulgation of official policies for MCSO.  Further, Sheriff Snyder is responsible for the promulgation of rules, practices, policies, and procedures for the efficient maintenance, supervision, and control of MSCO Deputies and the implementation of training to maintain an effective police force that is capable and prepared to deal with encounters with unarmed and non-threatening individuals.

92.     MCSO was deliberately indifferent to its responsibility to adequately prepare its deputies/officers for encounters with unarmed and non-threatening individuals and for their interaction with, detention, and arrest of the same.

93.     MCSO has had a history of similar violations by its Deputies who were not properly trained to reasonably and properly respond to individuals who are unarmed and non-threatening.

94.     These similar incidents include, but are not limited to, those which are specifically enumerated in Paragraphs 38 through 41 of this Complaint.  Many of these similar incidents resulted in the filing of a complaint with MCSO's Internal Affairs' Department, and a number of these similar incidents led to lawsuits resulting in the payment of awards or settlements by MCSO.

95.     These complaints, incidents, and lawsuits served to put Defendant MCSO on

31

notice and provided subjective knowledge of Defendant MCSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant MCSO's approach to the use of force, particularly in officer-related shootings and encounters with unarmed and non-threatening individuals.

96.     As illustrated in Paragraphs 39 through 41 of this Complaint, the incidents, shootings, and litigation history involving Defendant WARREN specifically put Defendant MCSO on notice of Defendant WARREN's unfitness for duty as a sworn deputy and provided subjective knowledge of Defendant MCSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant WARREN's approach to the use of force, particularly when involved in officer-related shootings and encounters with unarmed and non-threatening individuals.

97.     Furthermore, Defendant MCSO's lack of training for their Deputies in how to reasonably and properly respond to individuals who are unarmed and non-threatening created an obvious warning that a constitutional violation would result due to the high percentage of encounters between MCSO deputies and unarmed and non-threatening individuals.

98.     Defendant MCSO, through its policy custom, or usage, also hired deputies who were substandard and who were not properly trained and disciplined, including Defendant WARREN, who specifically had a criminal history and lacked sufficient defensive tactics training on the proper use of firearms, communications skills, and decision making skills.

99.     These constitutional deprivations were caused by Defendant MCSO's failure to adequately screen its employees and Defendant MCSO's failure to follow the proper hiring protocol, as set forth by its own handbook, before an offer of employment to a sworn law enforcement officer is extended.

100.    MCSO knew or should have known, due to the large number of unarmed and non-threatening individuals in Martin County and the large number of situations where such individuals are arrested, that its deputies/officers would routinely encounter unarmed and non-threatening persons and that these deputies/officers would need to be aware of the appropriate methods for the detention and/or arrest of an unarmed and non-threatening person.

101.    MCSO is charged with properly training officers with the available and necessary non-deadly-force skills that would allow officers to investigate a situation involving unarmed and non-threatening individuals and also maintain their own safety.

102.    MCSO was deliberately indifferent to its responsibility to create an effectively trained police force that could adequately respond to the scene of encounters with unarmed and non-threatening individuals.  All of the conduct at the scene to investigate the HASTON's situation was contrary to established police methods for interacting with unarmed and non-threatening persons.

103.    Thus, Defendant WARREN was not sufficiently trained to reasonably and effectively deal with his encounter with an unarmed and non-threatening HASTON.  All of the acts and omissions of Defendant WARREN were inappropriate to the situation and caused the encounter to be escalated.

104.    Further, Defendant WARREN was not provided with sufficiently detailed policies and procedures to use in investigating a situation involving unarmed and non-threatening individuals.  Defendant WARREN did not have the adequate direction or assistance with which to respond to the incident that occurred on June 7, 2013.

105.    All of the above referenced failures are the responsibility of MCSO, which was deliberately indifferent to its responsibility to have appropriate policies and procedures in place

and to train and supervise officers employed by MCSO to deal with the recurring situation of responding to calls involving unarmed and non-threatening individuals.

106.    Defendant MCSO ratified the misconduct of Defendant WARREN against HASTON including the use of excessive force, by failing to discipline Defendant WARREN, failing to conduct an adequate shooting investigation, and/or covering up Defendant WARREN's misconduct.

107.    As a result of Defendant MCSO's conduct, HASTON suffered physical injury, pain, suffering, emotional distress, disability, and death.

108.    As a result of HASTON's injury and death, Plaintiff is entitled to recover all damages allowable for violation of 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs pray for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

## COUNT V
### Negligent Hiring Against Defendant MCSO

109.    Plaintiff realleges the allegations contained in Paragraphs 1 through 8, 10 through 30, 33, 39, 50 and 51 as if fully set forth herein.

110.    At the time Defendant WARREN was hired by MCSO, his employment was conditional upon completion of the following examinations:

a.      Computerized Voice Stress Analyzer ("CVSA")

      b.     Psychological Evaluation
      c.     Background Investigation
      d.     Medical Examination
      e.     Drug Screen
      f.     Sheriff's Approval

111.    Defendant MCSO failed to properly screen Defendant WARREN based on the above-listed examinations.

112.    Namely, MCSO failed to properly investigate Defendant WARREN's arrest history and driving history. It is known that Defendant WARREN, prior to being sworn in as a deputy with MCSO, was twice arrested and charged.

113.    Specifically, on December 7, 1981, Defendant WARREN was arrested and charged with Fleeing and Alluding after "quickly" driving away from an officer following a stop. As a result Defendant WARREN's driver's license was suspended.

114.    Specifically, on January 19, 1983, in Stuart, Florida, Defendant WARREN was arrested and charged with Criminal Mischief. It was reported that Defendant WARREN unlawfully, willfully, and maliciously damaged a bathroom by tearing up bathroom fixtures. Defendant WARREN pled "No Contest" to the charges and was sentenced to six (6) months of probation.

115.    Defendant MCSO could have foreseen, at the time of hiring, the danger Defendant WARREN presented to HASTON and all other unarmed and non-threatening persons.

116.    Based on its failure to properly screen Defendant WARREN, it was unreasonable for MCSO to hire Defendant WARREN in light of information that it knew or should have known.

117.    As a result of Defendant MCSO's negligent hiring of Defendant WARREN, the injuries sustained by HASTON were within the zone of foreseeable risks.

118. As a direct and proximate result of Defendant WARREN's conduct, HASTON suffered physical injury, pain, suffering, emotional distress, disability, and death

119. LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, alleges all damages recoverable, including but not limited to the mental pain and suffering, which will continue to suffer for the rest of survivors' lives, the loss of services and support of HASTON, loss of net accumulations to the estate that would have been left as part of his estate if he had survived and lived his normal life expectancy, the funeral expenses as a result of HASTON's death, and the loss of HASTON's love and companionship.

WHEREFORE, Plaintiffs pray for the following relief:

a. Judgment for damages against Defendant MCSO;

b. Trial by jury as to all issues so triable; and

c. Such other relief as this Honorable Court may deem just and appropriate.

## COUNT VI
### Negligent Retention Against Defendant MCSO

120. Plaintiff realleges the allegations contained in Paragraphs 1 through 8, 10 through 33, 39 through 42, 47, 50 through 52, and 54 as if fully set forth herein.

121. At all times relevant and material hereto, Defendant WARREN was employed by Defendant MCSO as a Certified Sworn Law Enforcement Officer.

122. Defendant MCSO was aware, or should have become aware, of problems with Defendant WARREN that indicated his unfitness for duty as a Certified Sworn Law Enforcement Officer.

123. As illustrated in Paragraphs 39 through 41 of this Complaint, the incidents, shootings, and litigation history involving Defendant WARREN specifically put Defendant MCSO on notice of WARREN's unfitness for duty as a sworn deputy and provided subjective

36

knowledge of Defendant MCSO's need for better policies, procedures, customs, and practices as to the numerous deficiencies in Defendant WARREN's approach to the use of force, particularly when involved in officer-related shootings and encounters with unarmed and non-threatening individuals.

124.   Each investigation into Defendant WARREN's misconduct was authorized by Defendant MCSO, through its chief policy maker Sheriff Snyder.

125.   Defendant MCSO was on notice at the time of this incident of Defendant WARREN's history of complaints, litigation history, and repeated instances of unconstitutional and/or excessive use of force.

126.   Despite multiple documented complaints of excessive force, abuse of authority, neglect of duty, unprofessional conduct, and failure to adequately perform the duties of a sworn law enforcement officer, Defendant MCSO has made no effort to discipline or otherwise correct Defendant WARREN, due to the custom, practice, and policy of failing to discipline officers following misconduct and using unnecessary excessive force during arrests.

127.   Despite Defendant MCSO being on notice of the problems with Defendant WARREN's fitness as a deputy, it failed to properly investigate said allegations of misconduct and failed to take any corrective action.

128.   Defendant WARREN's past employment history demonstrates a proclivity of endangering the general public and individuals he arrests as well as a complete disregard for the duties and responsibilities of a sworn law enforcement officer. In the instant matter, those same tendencies resulted in the excessive and deadly force utilized against HASTON and the false and misleading statements made by WARREN in his police reports and recorded statements.

129.   As such, Defendant MCSO negligently retained as a Certified Sworn Law Enforcement Officer Defendant WARREN, for his illegal and unlawful actions prior to this incident.

130.   As a direct and proximate result of Defendant WARREN's conduct, HASTON suffered physical injury, pain, suffering, emotional distress, disability, and death

131.   LITITIA HINSON, as Personal Representative of the Estate of RICHARD HASTON, alleges all damages recoverable, including but not limited to the mental pain and suffering, which will continue to suffer for the rest of survivors' lives, the loss of services and support of HASTON, loss of net accumulations to the estate that would have been left as part of his estate if he had survived and lived his normal life expectancy, the funeral expenses as a result of HASTON's death, and the loss of HASTON's love and companionship.

WHEREFORE, Plaintiffs pray for the following relief:

a.   Judgment for damages against Defendant MCSO;

b.   Trial by jury as to all issues so triable; and

c.   Such other relief as this Honorable Court may deem just and appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

(a)   Declare that Defendants' acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U. S. Constitution under 42 U.S.C. §§ 1983.

(b)   Judgment in Plaintiff's favor as to all claims for relief.

(c )   Award compensatory damages.

(d)   Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action.

(e)   All other relief in law or equity to which Plaintiff is entitled and that the Court

deems equitable, just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

Respectfully submitted this 18th day of November, 2016.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the *Plaintiff's Third Amended Complaint* was filed with the Clerk via e-portal and a notice of electronic filing was sent via email to: Bruce W. Jolly, Esq., Purdy, Jolly Giuffreda & Barranco, P. A., 2455 East Sunrise Boulevard, Suite 1216, Fort Lauderdale, Florida 33304, email: bruce@purdylaw.com and susie@purdylaw.com this 18th day of November, 2016.

By:   /s/ Stuart N. Kaplan
STUART N. KAPLAN, ESQUIRE
Florida Bar No.: 0647934
**KAPLAN SCONZO & PARKER, P.A.**
PGA Financial Plaza
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Facsimile: (561) 296-7919
Email: skaplan@ksplaw.com
Secondary Email: jwise@ksplaw.com

IN THE CIRCUIT COURT IN AND FOR THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY FLORIDA

LITITIA HINSON, as Personal                      Case No.: 2014CA001137CAAXMX
Representative of the Estate of
RICHARD HASTON, deceased

        Plaintiff,

vs.

WILLIAM D. SNYDER, as Sheriff of
MARTIN COUNTY SHERIFF'S OFFICE

        Defendant.

_____/

## ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

THIS CAUSE, having come before the court upon Plaintiff's Motion for Leave to File

Third Amended Complaint and the court having heard argument of the parties, and being otherwise

duly advised in the premises, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Leave to File Third Amended

Complaint is hereby GRANTED/~~DENIED~~ _The amended complaint_

_is deemed filed. Defendant shall answer_

_within 20 days._

DONE AND ORDERED in Chambers, at Stuart, Martin County, Florida, this _20th_

day of _December_, 2016.

                               _F. Shields McManus_
                               Honorable F. Shields McManus
                               CIRCUIT COURT JUDGE

Copies Furnished To:
Stuart N. Kaplan, Esq., 3399 PGA Boulevard, Ste 150, Palm Beach Gardens. FL 33410,
skaplan@ksplaw.com; gsconzo@ksplaw.com; jwise@ksplaw.com
Bruce W. Jolly, Esq., 2455 East Sunrise Blvd., Ste 1216, Fort Lauderdale, Fl 33304,
bruce@purdylaw.com, susie@purdylaw.com

2016 DEC 20   AM 9: 16

FILED FOR RECORD
MARTIN CO., FL

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, STATE OF FLORIDA

### COURT MINUTE

Case# 14001137CAAXMX

Plaintiff: LITITIA HINSON AS PERSONAL     vs     Defendant: WILLIAM SNYDER AS SHERIFF
REPRESENTATIVE OF THE E                          OF MARTIN CTY SHERIFF'S

Convened on 12/20/2016 at 08:30 AM, with the Honorable F SHIELDS MCMANUS, presiding Court Officials
present were: _Greg Sconzo_ ✓                     _Matthew Wilder_ ✓
Plaintiff Atty: STUART KAPLAN                Defendant Atty: BRUCE WALLACE JOLLY
Court Reporter / Firm: _____
Deputy Clerk: Lori Mort                    Bailiff: _Terry Nolan_

Court was opened by Proclamation of the Bailiff:     PARTIES SWORN: ☐ YES   ☒ NO

HEARING - _PL Motion for Leave to File Third Amn. Complaint!_

OTHER CIVIL

_Granted_

_20 days to respond (file Answer)_

MOTION FOR FINAL JUDGMENT OF FORECLOSURE:   ☐ GRANTED   ☐ DENIED
Sale date is _____ at 10:00 am at www.martin.realforeclose.com

FINAL JUDGMENT: ☐ Plaintiff       ☐ Defendant
DAMAGE AMOUNT: $_____
COURT COST AMOUNT: $_____
TOTAL AMOUNT: $_____

DEC 20 AM 9: 18
MARTIN CO. FL
ED FOR RECORD

#2